The INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, an Unincorporated Labor Organization, Plaintiff,

v.

TRANS WORLD AIRLINES, INC., Defendant.

No. 86–6084–CV–SJ–6.

United States District Court, W.D. Missouri, St. Joseph Division.

Sept. 9, 1986.

---

**8.** 33 U.S.C.A. § 901–50 (West 1986).

**9.** 33 U.S.C.A. § 933(b) (West 1986).

Doyle R. Pryor, William A. Jolley, Jolley, Walsh, Hager & Gordon, Kansas City, Mo., for plaintiff.

Murray Gartner, Proskauer Rose Goetz & Mendelsohn, New York City, Paul E. Donnelly, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Plaintiff (IFFA), a union representing airline flight attendants employed by defendant (TWA), seeks partial summary judgment ruling the three major controversies presented in Count I of the first amended complaint. TWA has filed a motion seeking partial summary judgment in its favor on the same issues. The motions were argued August 25, 1986, and supplemental affidavits were received by leave of court thereafter.

This is a declaratory judgment action, with a prayer for incidental relief, relating to TWA's failure to reinstate striking flight attendants at the conclusion of a strike, in May 1986. In related litigation IFFA seeks a ruling that the strike was induced by unfair labor practices, in violation of the Railway Labor Act (RLA), 45 U.S.C. §§ 151, et seq. In the alternative, in this litigation the parties assume the court will conclude after a trial in the companion case that there was a strike over economic issues, beginning March 7, 1986. IFFA asserts that its members, as economic strikers, are entitled to reinstatement over three classes of current flight attendant employees of TWA: (1) some 1220 "new hires," employed in the first few days of the strike, who IFFA contends were permanent additions to the workforce rather than permanent replacements for strikers; (2) "junior crossovers," that is, persons who either worked throughout the strike or returned to work as flight attendants prior to 10:00 p.m. on May 17, 1986, when IFFA's

president tendered an offer to return to work (the number who would be displaced would be no more than 1284 crossovers, excluding those crossovers who may have seniority over full-term strikers); and (3) some 463 "trainees" who had begun flight attendant training but had not completed such training on May 17, 1986.

TWA has reinstated fewer than 200 full-term strikers. TWA contends that all of the above categories of workers are entitled to remain on their jobs if, as TWA contends, the strike in question was simply an economic strike. TWA further contends that IFFA did not make an unconditional offer to return to work, as is required before a duty to reemploy strikers occurs.

All parties seek prompt resolution of these questions and have been cooperative in stipulating to pertinent facts and in supplementing such agreed facts with affidavits rather than engaging in contentious discovery. The court relies on a major stipulation filed July 21, 1986, and has received supplemental affidavits from affiants Frankovich (August 22), Peltzman and Laursen (August 25), Hoar (August 29), and Chimenti (September 8), as well as large collections of affidavits filed by TWA on August 12 and by IFFA on September 2 and 3. I conclude that there are no controversies regarding pertinent facts that would preclude summary judgment. Facts necessary to ruling will be recited in connection with the analysis of the union's three basic claims and the "conditional offer" defense. That general defense will be rejected, for reasons set forth below. TWA is entitled to prevail, in my opinion, on two of the three substantive controversies, and IFFA is entitled to prevail on one of them (the "trainee" issue).

## I—"UNCONDITIONAL OFFER" TO RETURN TO WORK

■ Before an employer is required to reinstate economic strikers, and to desist from employing new hires, the parties agree the law requires that the economic strikers must make an unconditional offer to return to work. IFFA contends this occurred at 10:00 p.m. on May 17, 1986, when its president, Frankovich, delivered to a TWA official, Hoar, a written statement offering on behalf of the strikers to abandon the strike and return to work. TWA contends there were certain qualifications and conditions unresolved. In any event, TWA began implementing a reinstatement plan, pursuant to Hoar's letter to Frankovich on May 23, 1986. TWA asserts there was a reservation of rights in Hoar's letter.

On its face, the May 17 letter (Stip. Exh. 5) is an unconditional offer, though coupled with an assertion that the IFFA strikers have a right to reinstatement as unfair labor practice strikers. Hoar correctly describes it as an offer "on behalf of all the strikers, to return to work immediately." Hoar Aff. August 29, 1986. At various times during the next few days, TWA raised questions about (1) whether IFFA was demanding return in seniority order, (2) whether IFFA might resume striking if its members rejected TWA's latest settlement proposal, and (3) whether picketing and in particular notices that a strike was in progress were inconsistent with the offer to return.

On Sunday, May 18, Frankovich delivered a "clarifying" letter (Stip. Exh. 6) offering to return the employees in seniority order and asserting a legal duty to reinstate employees in that order but stating, "Lest there be any misunderstanding, IFFA's unconditional offer is made independent of and irrespective of the outcome of the membership ratification vote on TWA's latest proposal. Moreover, employees will return to work as directed by the Company." It was further asserted that TWA acts "at its peril" legally if reinstatements were made out of seniority order. While TWA asserts this letter is ambiguous, I believe it reaffirms the unambiguous offer of May 17 and is itself fully consistent with an unconditional offer to return to work.

Frankovich further recites, in an uncontested portion of her affidavit (Frankovich Aff. August 22, 1986), that she gave immediate instructions on May 17 to stop picket-

ing with strike notices. She did not agree to refrain from informational activities publicizing the continuing dispute with TWA. All this seems legally proper, and the fact that some strike notices were displayed in New York prior to TWA's consent to reinstate strikers was apparently inadvertent and not inconsistent with an unconditional offer to return to work. At that point the unreinstated workers were in fact "on strike" involuntarily.

The Hoar letter of May 23 (attached to Hoar Aff. August 29, 1986) continues to protest the alleged lack of an unconditional offer to return to work, and may thus be said to contain a reservation of rights, as TWA contends. As stated above, however, I conclude the offer to return was unconditional, and created a duty to reinstate economic strikers in vacancies as they develop in the flight attendant workforce.[1]

## II—CROSSOVERS

■ At the conclusion of argument of the summary judgment motions I stated from the bench a conclusion that "junior crossovers" are entitled to retain their positions at the end of an economic strike, and cannot be displaced by the exercise of "bumping" rights of full-term strikers who may enjoy seniority.

The contract between IFFA and TWA, which I have ruled (in other litigation) still exists, does not authorize the exercise of seniority rights to obtain reinstatement after a strike. It does authorize use of seniority to obtain reinstatement after layoffs, but that is a different situation. IFFA argues, however, that labor law principles establish a right to reinstatement, except as to new hires employed during the strike as permanent replacements for strikers.

It is not necessary to recite the law generally applicable to the right to reinstatement following an economic strike. A brief overview of the development of the applicable law, under the National Labor Relations Act, appears in the Eighth Circuit opinion of Judge Arnold in *Randall, Division of Textron, Inc. v. NLRB*, 687 F.2d 1240, 1244 (8th Cir.1982), (cert. den. 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983)). In *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), the Court struck down an employer's plan to grant twenty years' "superseniority" to persons permanently employed during a strike, but stated that "an employer may operate his plant during a strike and at its conclusion need not discharge those who worked during the strike in order to make way for returning strikers." 373 U.S. at 232, 83 S.Ct. at 1147. This language from *Erie Resistor* would protect crossovers as well as new hires from being displaced after a strike.

The *Randall* case contains a similar broad statement of the general rule. Although holding that Randall had violated the law by giving a form of "superseniority," the court's criticism was that Randall had given "additional preference besides permanence to those who remained at work as opposed to those who struck ..." 687 F.2d at 1246. It is quite clear that the Eighth Circuit had no criticism of simply giving "permanence" to those who remained at work. It is equally clear that the court knew it was dealing with a situation involving crossovers as well as new hires.

1. The letter has some significance, however, in appraising the respective rights of striking flight attendants and trainees who had been given the title but not the work of a flight attendant prior to the end of the strike. Hoar states he is freezing "our active permanent Flight Attendant work force" and that strikers will be placed on a preferential rehire list "from which they shall be rehired for active service if immediately available for such service to fill vacancies in order of seniority ..." This wording distinguishes between active service flight attendants and other employees (such as strikers and trainees) who bear that title. It seems to be a commitment not to place trainees in "active service" vacancies after May 23. It appears, however, that trainees were placed as "active flight attendants" ahead of strikers, "beginning the last week of May." Stip. ¶ 24. To the extent that TWA had previously promised trainees they would not be required to yield to strikers, TWA seems to have given two conflicting commitments.

In the *Randall* case, as recited by the Court of Appeals, one production worker remained with the employer throughout the strike and a "steady stream of individual strikers" signed up for work during the strike. Crossovers were then accepted back on the job in preference to hiring permanent replacements. Although six unfair labor practice charges were sustained by the Administrative Law Judge, there was no finding of unlawful discrimination in the retention of crossovers over full-term strikers who may have had seniority. Such favored treatment may not even have been challenged. When Judge Arnold implied that "permanence" of tenure alone would not be objectionable, if no additional preference were given to "those who remained at work," the Eighth Circuit thereby gave implicit sanction to the conduct of which IFFA now complains.

IFFA relies on two cases from other circuits, however, and in addition contends that the Railway Labor Act should be interpreted to give greater protection for strikers than is conferred by the National Labor Relations Act.

IFFA cites *George Banta Co., Inc. v. NLRB*, 686 F.2d 10 (D.C.Cir.1982), (cert. den. 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983)). It is not clear that *Banta* dealt with unreinstated strikers, at least when the case reached the court of appeals. Even if some of the remarks of the court may be favorable to the IFFA contention, no reason was suggested for differentiating between new hires and crossovers. The right to retain permanent new hires was said to be "one significant exception" to the right of reinstatement of economic strikers (686 F.2d at 20) but the court did not explain, and perhaps had no occasion to explain, why the protection of new hires should not apply equally to crossovers who may lack seniority.

The other case principally relied on by IFFA is *IAM v. J.L. Clark Company*, 471 F.2d 694 (7th Cir.1972). In that case two judges on the panel held that a crossover who lacks seniority may be "bumped" by a returning striker having greater seniority, if the crossover has not changed his work during the strike and replaced the striker in his old job. No authority or reason for such right of reinstatement was given, other than that Supreme Court decisions have only given protection to permanent replacements. The dissent, by Judge Pell, observed that Supreme Court decisions give "no indication that the strikers who returned to work during the strike were any less protected than the new employees ..." 471 F.2d at 700. Judge Pell saw no reason to give special preference to new hires, as against crossovers, and no reason has been suggested by IFFA in this case or is developed in any of the other authorities reviewed by the court.

It would seem that employers faced with a strike would have at least as great a practical need for employing crossovers as new hires, if crossovers can be induced to return to work. The inducement of permanent rather than temporary employment is deemed presumptively needed to attract new hires, according to the Court in the landmark decision of *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

Inducement of similar attractiveness would seem normally required to retain old employees during a strike, or to attract them back.[2] It is surely as difficult psychologically for old employees to abandon their coworkers and cross a picket line as it is for new hires to take such action. If *Mackay Radio* is sound (and I recognize that some academic critics advocate disabl-

---

2. IFFA's briefing tacitly concedes that TWA made a commitment to its crossovers that they could retain their jobs after the strike. One specific "guarantee" against replacement was made on March 17, 1986. Exh. 22 to Borden affidavit filed August 12, 1986. Even as to crossovers employed during the first ten days of the strike, this commitment seems effective as a guarantee of "permanence." Cf. *NLRB v. Murray Products, Inc.*, 584 F.2d 934, 939 (9th Cir. 1978) (belated decision to offer permanence not effective where not communicated). At least one prestrike communication seems to promise prospective crossovers that they will not be replaced by strikers. Exh. 13 to Borden Aff. of August 12, 1986.

ing employers from hiring permanent replacements for strikers) the same principles would seem to apply to protect crossovers.

TWA cites one decision in the Sixth Circuit that indicates that strikers have no right to "bump" crossovers, if post-strike work of the employer is insufficient to keep all employed. *NLRB v. Harrison Ready Mix Concrete,* 770 F.2d 78 (6th Cir.1985). Additional cases from the Seventh Circuit, such as *Giddings & Lewis v. NLRB,* 675 F.2d 926 (7th Cir.1982), make questionable whether *J.L. Clark* would still be followed by that court.

The language of the courts in *Erie Resistor* and *Randall* is broadly protective of the rights of all persons who work during a strike. The breadth of that language seems fully justified in principle and will be followed in this decision.

IFFA's final argument for its contention that strikers should have the right to displace crossovers is that the court should disregard the NLRA precedents in favor of the allegedly greater protection given employees under the Railway Labor Act. This contention, which was emphasized at oral argument, is wholly lacking in support in the cases. On the contrary, the Second Circuit has recently noted that the Railway Labor Act explicitly protects only "organizing and representational rights, as opposed to the broader 'concerted activity' rights under the Wagner Act." *IUFA v. Pan American World Airways,* 789 F.2d 139, 141 n. 2 (2d Cir.1986). The only suggestion that employees may have greater rights under the Railway Labor Act is contained in rulings where express restrictions in the NLRA do not appear in the RLA. *E.g., BRT v. Jacksonville Term. Co.,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). In the present context it seems desirable to draw on NLRA experience rather than to create novel principles applicable only in the Railway Labor Act context. A few courts have so ruled, when considering reinstatement rights of airline strikers. *Na-*

*tional Airlines, Inc. v. IAM,* 416 F.2d 998, 1006 (5th Cir.1969); *ALPA v. United Airlines,* 614 F.Supp. 1020 (N.D.Ill.1985).

On the assumption that the IFFA strike that began March 7 was an economic strike, it is therefore concluded that none of the 1284 crossovers are subject to being displaced by more senior unreinstated strikers.

### III—NEW HIRES

■ Treating the new hires who came to work on and after March 7, 1986, as permanent flight attendants, IFFA nonetheless contends that their employment cannot block the return of full-term strikers to the payroll because it characterizes the new hires as permanent *additions* to the workforce rather than as replacements for strikers. IFFA relies on a pre-strike notice by TWA to prospective flight attendants (Stip. Exh. 9) that promised them employment if they came to the TWA premises on March 7 to receive a formal offer of employment, regardless of whether there was a strike on that date.[3]

TWA explains by affidavit (Borden Aff. August 12, 1986) that its planners anticipated a need for the new flight attendants in any event. If there were a strike, TWA would need replacements for strikers. If there were no strike, TWA expected that large numbers of its flight attendants would promptly elect to take early retirement on favorable terms that would be appealing to those who chose not to remain at work at reduced salaries. TWA contends that the occurrence of the strike on March 7 eliminated the special early retirement offer and the prospect that flight attendants might need to fill the jobs of retirees. Thus, TWA asserts, the alternative of being strike replacements was the eventuality that was ultimately realized.

TWA's factual contention seems the only realistic, practical way of looking at what occurred. The new hires went through picket lines to receive the formal offers of

---

**3.** IFFA's initial briefing contends that the notice itself is dispositive of the entire issue. It is difficult to understand that contention because the notice expressly referred to the possibility that the new hires might be needed for strike duty.

employment. Affidavits have been filed by the TWA personnel charged with processing new hires stating that groups of new hires were lectured about their role as strike replacements on March 7 and the next few days, when the persons in question assumed their positions. While it is not established by affidavit that the term "strike replacements" was regularly or frequently used in describing the function of the new hires, it can hardly have escaped their attention that a strike was in progress, that TWA's flight attendants were for the most part on strike, and that they as newly hired flight attendants were replacing the strikers.

IFFA responds with affidavits from a number of former employees hired on March 7 and the subsequent days denying that the term "strike replacements" was used in explaining their role. They uniformly deny they understood they were being asked to serve as strike replacements. Some of the affidavits state, however, that the affiants were told they would be required to cross picket lines if they wanted to retain their jobs and that jobs would be immediately available if there were a strike, but work would not be immediately available otherwise. Taylor Aff. of September 3, Martoia Aff. of September 2, Speere and Alexander drafts of affidavits of September 2 (usable as admissions by IFFA). IFFA contends that mere subjective theories of an employer do not create a status, citing a case where temporary employees were not treated as permanent replacements in the absence of evidence that the employer's description of their status was expressed to the employees. *NLRB v. Murray Products, Inc., supra.* While the case so holds, in considering the issue of "permanence," a matter of contract, I doubt that mutual understanding or formal notice is required on the issue of whether an employee is a strike replacement. That may be treated as a matter of fact, depending on how the employee was actually used.

It remains clear, however, even considering the IFFA affidavits, that under the circumstances of a strike the new hires had been at least twice advised in writing that they would be strike replacements if employed as new hires after a strike began. Mr. Borden's written statements to that effect, dated November 22, 1985, and February 10, 1986, were distributed to Travel College graduates and students. Borden Aff. ¶¶ 32, 40, referring to Borden Exhibits 8 and 11 (filed August 12, 1986). The only reasonable understanding beginning March 7 was that the new hires were being employed for permanent jobs, with initial service that may be legalistically referred to as "strike replacement" or more commonly termed strikebreaking. This is doubtless the way IFFA described the work at the time, and the description seems accurate. In the derogatory term of the labor movement, the new hires were "scabs." [4]

It is not necessary for this decision to weigh the credibility of some of the affidavits, particularly the denial that the affiants "understood" they were being offered work as strike replacements. I believe the term as used in *Mackay Radio* is indistinguishable from strikebreaking, and the facts here speak for themselves. It is possible, however, it was used in the affidavits in a post-strike sense; that is, that the affiants may have thought the new hires could continue working (as promised) and that the returning strikers would *also* have jobs. In that sense, the affiants may have been stating that they did not believe they were being employed to permanently replace strikers but would become additions to the workforce. This may have been somewhat unrealistic, but it may fairly be treated as a credible assertion of subjective belief and I so construe it.

---

**4.** It seems immaterial for present purposes that TWA may have somewhat overemphasized the prospects for employment without a strike or that some officials may have denied that it was simply operating a school for "scabs." The alternative of using the pre-strike trainees as strike replacements was expressed in writing, distributed to the trainees by TWA. Borden Aff. ¶¶ 32, 40.

Nothing in *Mackay Radio* requires, however, that strikebreakers who have been offered permanent jobs be told that the employer anticipates the permanent displacement of the economic strikers. Such displacement is permissible under that decision depending on economic needs of the employer after the strike.

The only case purportedly contrary to this view is *Murray Products, supra,* where one employee was referred to as an addition to the workforce whose employment could not be used as a bar to reinstating a returning striker. While the Ninth Circuit may have been a bit generous in ruling that case involving the status of a single employee, it was simply accepting a finding that a new hire was told unconditionally that he was taking a "new position." That did not happen here. I do not believe *Mackay Radio* would permit a ruling that large numbers of strikers must be reinstated, regardless of TWA's economic needs, simply because some of those who replaced them during the strike and were promised permanent jobs had a confused notion that there would be room for everyone after the strike.[5]

For the foregoing reasons, I conclude that the new hires employed on and shortly after March 7, 1986, cannot be displaced by returning economic strikers. Moreover, such persons should not be categorized as additions to the flight attendant workforce whose employment would not block the return of economic strikers. The new hires during the strike were employed as strikebreakers, sometimes called permanent replacements, and had been so notified.

## IV—TRAINEES

TWA contends that 463 persons who were still trainees on the date the strike ended may be treated as permanent replacements as flight attendants because they were on TWA's payroll as flight attendants from the time of entry in training school, and were paid as flight attendants. It cites cases holding that persons in training are not precluded from being considered replacements for fully trained strikers. Other authorities hold that promises of employment may be honored after a strike, at least when the belated arrival of the employee on the job occurs within a reasonable time after the strike ends. At the beginning of the strike, however, presumably with legal counsel, TWA informed an earlier group of trainees that the law provided them with assurance of permanent jobs "if you're hired and working as a Flight Attendant." Stip. Exh. 12. TWA statements on March 28 and April 15 likewise offered permanent status to "working flight attendants." Exhibits 24 and 25 to Borden Affidavit of August 12, 1986.

A decision which is most helpful to the ruling of this issue is Judge Friendly's opinion in *H.F. Binch Co. v. NLRB*, 456 F.2d 357 (2d Cir.1972). In that case the question was whether replacements had occurred before the end of a strike at 2:00 p.m. on March 16, 1968. On that day the mother of one replacement purported to accept the employer's job offer for him, and the employer made a record entry of employment, but the replacement did not appear on the job for processing of application papers until three days later. Another purported replacement had indicated a desire for regular employment before the strike ended and a record entry had also been made by the employer showing that she had replaced a striker. The court ruled that strikers had not been effectively replaced in either instance. Two other employees who had transferred to strikers' jobs and were "actually at work" when the strike ended were held to have displaced strikers.

---

**5.** If the law were to the contrary, it would apparently be necessary to try the individual situations and understandings of more than 1000 current employees (none of whom has filed an affidavit) to ascertain whether they thought they were permanently displacing strikers or would be treated as additions to the workforce after the strike. Given the delay and uncertainty posed by such an issue, the parties may be fortunate that I do not believe *Mackay Radio* requires anything other than the offering of permanent positions to new hires being used as strikebreakers.

The court ruled that determination of the question of "just what circumstances constituted a hiring to fill the place of strikers ... must be answered in a practical frame." 456 F.2d at 361. Although the court drew a protective line in that case around employees who were actually at work when the strike ended, Judge Friendly stated that "actual arrival on the job should not be required if an understanding has been reached that this will occur at a reasonably early date." 456 F.2d at 362. If the hiring process had proceeded so far that the replacement "would have reasonable 'grounds for indignation' if he were subsequently denied the promised job" Judge Friendly was prepared to accept the replacement as effective. More than an employer's promise is required, under the Friendly test, however; there must, in addition, be an expectation that arrival on the job will occur "at a reasonably early date."

The three day delay in availability in one instance in *Binch* apparently made ruling against that purported replacement comparatively easy. Under the *Binch* decision, it would not seem that a striker must wait around for a replacement who is not essentially ready for work. While an unseemly race is not required, very prompt availability seems necessary. One can conceive of a situation where a replacement might fairly be allowed several days, if in transit to a distant job, for example. But arrival at a "reasonably early date" should not require a returning striker to stand idly by and watch a job disappear during a substantial or unjustified waiting period.

In the present case, TWA has available a series of arguments. One is that the trainees in question had been upgraded in company records to flight attendants and were being paid as flight attendants, so they should be deemed to be flight attendants for purposes of displacing strikers, regardless of their total lack of on-the-job experience. A second theory is that at least some of the trainees were ready for work within a very few days of May 17. Finally, the necessity of a training period is at least arguably consistent with the requirement of arrival at a "reasonably early date,"

when all the trainees were placed within a six week period.

The Peltzman affidavit, filed August 25, shows that all but five of the trainees completed their training and were placed on "operating experience" flights beginning May 20 and ending June 3. They performed flight attendants' duties, under supervision, on "revenue flights" originating in St. Louis. Placement occurred every day, including Saturdays and Sundays. There was, however, a break between the evening of May 17 (when Frankovich made IFFA's offer to return to work) and the first operating experience flight for 18 trainees on May 20. We are not informed when the trainees began their regular, unsupervised duties at an assigned domicile. But it may be sound, using NLRA precedents, to count on-the-job training as a basis for replacing strikers. The Peltzman affidavit is, therefore, usable proof.

What should be treated as a "reasonable time," however, under these circumstances? If the month of May were used to protect replacement rights, most of the trainees would prevail, but 71 would be deemed tardy. If trainees were deemed to be required to begin their operating experience flights within five days of the strikers' offer to return to work, however, 80 would prevail, but the bulk of the trainees would be considered too late. If a two-day rule were used, none of the trainees would win.

The two-day rule seems most consistent with Judge Friendly's concept in the *Binch* case. It has the additional advantage of using the only period in the record where there was an appreciable break in the process. It would appear that word of the Frankovich offer was very promptly circulated, and enabled TWA to call a halt to its operating experience flights on Sunday, May 18, and on Monday, May 19. The resumption of such flights on May 20 suggests a reconsideration by TWA, and adoption of a "hard line" favoring replacement of strikers. That apparent change in tactics may be fairly treated as untimely. If

TWA was reasonably able to stop the trainees from going through their final training period, it was obligated to do so, in order that its conflicting legal duty to returning strikers could be honored.[6]

One must reject the theory that a mere job title and rate of compensation should be deemed to establish status as a flight attendant, sufficient to withstand the claims of returning strikers. A trainee who has never served as a flight attendant (even as an apprentice under supervision) should not be given priority of rights, if the questions presented are to be answered "in a practical frame," as Judge Friendly suggests.

Allowing TWA to continue training replacements for weeks after the strike had ended, and giving such trainees priority over returning strikers, does not seem to satisfy the *Binch* rule that on-the-job service must begin at a "reasonably early date" after commitments have been made. I must respectfully disagree with what seems to be a contrary ruling by Judge Bua, therefore, when he allowed displacement of striking pilots with new hires, after the conclusion of a pilots' strike, even though the employer necessarily deferred actual assignments of such new hires until their completion of a training program. *ALPA v. United Air Lines, Inc.*, 616 F.Supp. 849, 851 (E.D.Ill.1985). For reasons I shall discuss further, this seems an unsound loosening of the *Binch* test, which was cited by Judge Bua as the controlling general principle.[7]

It would distinctly expand the *Mackay Radio* principle if permanent replacements were to include not only persons who begin working during the strike or immediately thereafter but also persons who are simply in training at some other site. The expansion seems unwarranted. *Mackay Radio* was designed to meet a perceived need by employers to offer permanent jobs to strike replacements; otherwise, it is presumed, it will be extremely difficult to recruit persons who will replace strikers, most typically by going through a hostile picket line set up by persons endangered by the prospective loss of a job. Merely attending a training school typically presents an easier situation. While strikers may be expected to bombard trainees with propaganda, the imminent danger of truly hostile words and conduct would not seem as likely. Therefore, unlike the *Mackay Radio* situation, a pressing need to offer permanent positions to trainees should not be presumed.

In the present case, I am aware of contentions by TWA that there was hostility expressed by IFFA picketers at the training school and that TWA felt a business need to offer the trainees permanent jobs. Henderson Aff. August 12, 1986, ¶¶ 29, 42, 44, 56. The degree of hostility has not been shown to approach that directed toward employees on active service, however, where there were documented reports of obscene telephone calls, verbal threats of bodily harm and physical assaults. Borden Aff. ¶¶ 88, 89. Mr. Henderson seems simply to be reporting his own impressions, without offering any basis for making comparisons with what was occurring at the airports.

A TWA management official may well have sensed hostility at the picket line that was no problem for trainees. No complaints from trainees have been disclosed, and no affidavits filed. While the question may be close, I do not believe the Henderson affidavit suffices to justify an enlargement of *Mackay Radio*. A better appraisal

---

**6.** As previously discussed in footnote 1, moreover, on May 23 TWA told returning strikers that they would have prior rights to vacancies in "active service." In violation of this commitment, TWA apparently began to place trainees in active service on and after May 24, 1986. It is unlikely that *Mackay Radio* protects commitments to replacements when an employer has also made conflicting commitments to returning strikers.

**7.** The *ALPA* case is on appeal, and has been argued. The briefing suggests that for tactical purposes or otherwise the union is seeking an "all or nothing" ruling. The entire group of unreinstated pilots seeks reinstatement on the theory there was an unfair labor practice committed; little if any effort was made on appeal, and perhaps not before the district court, to replace the late trainees as a separate group.

might be made after a hearing, but it seems desirable to rule as a matter of law, rather than create factual issues that must be fully litigated in each case before management or labor will be able to know their rights in a training school context. The Henderson affidavit, moreover, is so conclusory, lacking in details and explanations, that a ruling of insufficiency of evidence as a matter of law would probably be justified at trial, given the substantial demonstration of business necessity that I believe is required. If so, summary judgment is authorized. *See Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The "sketchy beginning" of a contention is no bar to summary judgment. *Brown v. Trans World Airlines, Inc.,* 569 F.Supp. 247, 255 (W.D.Mo.1983), *aff'd.* 746 F.2d 1354 (8th Cir.1984).

The training school experience was not so onerous as to cause TWA to dispense with charging trainees $2500 for the right to participate in the training program. It would seem that the rights of economic strikers, earned as employees after years of service, should have sufficient legal status so that TWA should at least have experimented with a reduction in or relinquishment of the tuition charge before offering trainees permanent employment rights, at the expense of the strikers. When people are willing to pay to cross a training school picket line, there can hardly be said to be an obvious business necessity to offer them guarantees of permanent jobs while they are in school.[8]

It is therefore determined, accepting the materials submitted by TWA, that the 463 trainees who had engaged in no operating experience flights prior to May 20, 1986, and were apparently not assigned to working positions until at least May 24, 1986, were not properly retained as TWA flight attendants in preference to returning strikers. TWA will be required to reinstate returning strikers displaced by such trainees, with back pay.

## CONCLUSION

It is therefore ORDERED that partial summary judgment be entered in favor of TWA on IFFA's claims in Count I for reinstatement of economic strikers displaced by crossovers and new hires who worked during the strike, and that partial summary judgment be entered in favor of IFFA on its claim for reinstatement of economic strikers displaced by trainees who did not have operating experience flights prior to May 20, 1986, and were not assigned to active service as regular flight attendants on revenue flights prior to May 24, 1986.

Economic strikers with enough seniority to have been reinstated if the 463 trainees had been displaced instead of given positions in active service shall be reinstated within 30 days, absent a stay pending appeal. Back pay with interest, less interim earnings, shall be promptly paid such reinstated strikers. In all other respects, IFFA's claim for injunctive relief is DENIED. SO ORDERED.

The court retains jurisdiction to modify or enforce this order. A motion for stay of relief granted pending appeal will be considered by this court, given the closeness of the legal questions and the considerable dislocation caused by this ruling if there is a reversal.

---

**8.** The present ruling does not, of course, deal with the question of whether former trainees now serving as flight attendants may have some claims against TWA for displacing them with former strikers, under court order. Conceivably they may have rights under state law for return of their tuition fees or other remedies. *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983).