The **WATERBURY HOSPITAL,**
Petitioner–Cross–
Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent–Cross–
Petitioner.

Nos. 1528, 1529, Dockets
91–4018, 91–4032.

United States Court of Appeals,
Second Circuit.

Argued May 20, 1991.

Decided Dec. 3, 1991.

George Bradford Palmer, Jr., Waterbury, Conn. (D. Charles Stohler, Carmody & Torrance, Waterbury, Conn., on the brief), for petitioner-cross-respondent.

Linda Dreeben, Supervisory Atty., N.L.R.B., Washington, D.C. (Margaret E. Luke, Atty., Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, D.C., on the brief), for respondent-cross-petitioner.

Before KEARSE, MAHONEY and SNEED *, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner The Waterbury Hospital (the "Hospital") petitions for review of so much of an order of respondent National Labor Relations Board (the "Board") as found the Hospital in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1) and (3) (1988), and ordered it to, *inter alia*, cease and desist from refusing to reinstate striking employees to their former positions and from according job preferences to nonstrikers over strikers. In support of its petition, the Hospital contends principally that the Board made inadequate findings of fact, applied incorrect standards of law, and improperly rejected the Hospital's business-justification defense. The Board cross-petitions for enforcement of its order. For the reasons below, we deny the Hospital's petition for review and grant the Board's cross-petition for enforcement.

## I. BACKGROUND

The Hospital operates a nonprofit community hospital in Waterbury, Connecticut, normally employing some 600 nurses. Prior to May 31, 1986, it was party to a collective bargaining agreement with the union representing the nurses, Connecticut Health Care Associates, District 1199, National Union of Hospital and Health Care Employees, AFL–CIO ("the Union"). The period covered by that agreement ended on May 31, 1986, without a new agreement having been reached, and the Union served a strike notice on the Hospital. The Hospital promptly shut down, laying off all employees. On June 4, the Union commenced a strike against the Hospital.

---

* Honorable Joseph T. Sneed, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

## A. The Hospital's Hiring of Nurses During the Strike

In mid-June, responding to community needs for prenatal care and one-day surgical services, the Hospital reopened two of its units, staffing them with managerial and/or supervisory nursing employees. Thereafter, it decided to reopen some, though not all, of its other units. Some employee nurses abandoned the strike and crossed the picket line (the "crossovers"). The Hospital also began to hire new nurses. It offered both the new employees and the crossovers (collectively the "nonstrikers") their choices of positions, including shifts; if the nonstriker's preferred position was in a department that was neither open nor immediately to be reopened, or in one that was open but not in immediate need of such a position, the Hospital guaranteed that that individual would be placed in the preferred position following the conclusion of the strike. Individual contracts with the nonstrikers stated:

> In view of the labor dispute currently under way at the Hospital, the position offered to you is a permanent position which you shall retain, subject to satisfactory performance, regardless of how the labor dispute is finally resolved.... [D]epending on scheduling, patient census, and other factors your first week of employment might require you to work on a rotating shift basis or in another unit until your job opens.

In August, the Hospital and the Union resumed contract negotiations. The Union proposed that all striking nurses, including crossovers, be returned to their prestrike positions. The Hospital took the stance that all nonstrikers were hired as permanent replacements in their guaranteed positions, although many of them did not occupy those positions during the strike. On October 4, 1986, a new collective bargaining agreement was signed, and the Union notified the Hospital of its unconditional offer to have the striking workers return to work. The new collective bargaining agreement provided that striking nurses would be returned to work as soon as the patient population warranted but did not guarantee that those nurses would be rein-

stated in their prior positions. In addition, while reserving to the Union and the Hospital their respective rights to pursue any legal claims, the agreement provided that the nonstrikers would not be subject to displacement from their chosen positions for a period of 12 months after the end of the strike (the "no-bumping provision").

By October 4, the Hospital's nursing staff totaled 109 nonstrikers: 62 crossovers who had returned to their prestrike positions, 19 crossovers who had taken different positions, and 28 newly hired nurses. After striking nurses began returning to work on October 5, 1986, the Hospital began opening the units that had been closed during the strike. Strikers whose positions had been filled by or promised to nonstrikers were not returned to those positions.

## B. The Board's Ruling

During the strike, the Union had filed unfair labor practice charges with the Board, complaining of the Hospital's refusal to reinstate all strikers to their prestrike positions, and it pursued those charges after the end of the strike. The Board, adopting the decision of an administrative law judge entered after an evidentiary hearing ("Board Decision"), concluded that the Hospital had engaged in unfair labor practices in violation of §§ 8(a)(1) and (3) of the Act by (1) refusing to reinstate some striking nurses to their prestrike positions and discriminating in favor of nonstrikers in the awarding of such positions, and (2) using the no-bumping provision to grant superseniority rights to nonstrikers for the 12 months following the conclusion of the strike.

The Board discussed the pertinent Supreme Court and circuit cases and stated that

> [t]he law is clear that an employer may lawfully hire permanent replacements, including new hires and crossover employees, for striking employees during the course of an economic strike and at the end of the strike is not required to discharge or layoff such permanent replacements in order to cr[e]ate vacancies

for the striking employees seeking reinstatement.... However, both the Courts and the Board have recognized some limitation on an employer's right to refuse reinstatement to an economic striker under the "legitimate and substantial business justification["] [ ]rationale on the basis of a consideration of what constitutes a "permanent replacement."

Board Decision at 39–40. The Board rejected the contention that the Hospital had been forced to offer an unrestricted choice of positions and to make the replacements permanent in order to hire nurses during the strike, noting that the Hospital had offered no proof that nonstrikers could not have been recruited by other means. The Board found some of the circumstances of the present case somewhat analogous to those in *Lincoln Hills Nursing Home*, 257 N.L.R.B. 1145, 1159 (1981), in which replacements had impermissibly been given positions that were not actually vacant or available during the strike.

In the present case, the Board found that two categories of nonstrikers were not permanent replacements because they had been given poststrike positions that were not the positions they occupied during the strike. First, noting that some nonstrikers were given poststrike positions in departments that had not been open during the strike, it found those positions not actually available during the strike and concluded that the nonstrikers given those positions should not be considered permanent replacements. The Board judged it

inherently destructive of strikers['] reinstated [*sic*] rights for the [Hospital] to accord striker replacements preferences by awarding them positions in areas of the hospital which did not open until after the strike ended and at a time when there were striking employees with greater seniority awaiting reinstatement.

Board Decision at 42. Second, with respect to departments that were open during the strike, the Board found that nonstrikers who during the strike were neither working in their poststrike positions nor being trained for those positions were not to be considered permanent replacements.

On the other hand, the Board ruled that nonstrikers who continued after the strike to fill positions they had filled during the strike were properly considered permanent replacements. Further, as to nonstrikers who did not fill their poststrike positions during the strike, the Board ruled that if their poststrike positions were in departments that were open during the strike and they were being trained for those positions during the strike, they would be deemed permanent replacements.

Thus, the Board summarized its rulings as follows:

The [Hospital] acknowledged that it had not and reasonably could not set an actual date for the reopening of the closed hospital areas nor predict with some reliability when already reopened areas would expand their services. Therefore, under these circumstances, unless the "replacement" commenced working in the position awarded during the strike and prior to the striker's unconditional offer to return to work, the non-striking employee would not be a "permanent replacement" justifying the denial of reinstatement to returning strikers. Of course this would not include instances wherein the [Hospital] awarded positions to more nonstrikers in a hospital area than the Hospital's operational needs required and some of these "replacements" were in training sessions or in orientation in or away from their positions or areas.

Board Decision at 43–44 (footnotes omitted). As an illustration of this last group, *i.e.*, replacements who did not occupy their poststrike positions during the strike but whom the Board considered permanent replacements because their positions were in departments that were open during the strike and they were in training or orientation for those positions, the Board noted testimony that at the conclusion of the strike there were more nurses in the Recovery Room than would have been warranted by the then-patient population but that "some of these nurses were at training classes." *Id.* at 44 n. 91. As to the departments that were closed throughout the strike, the Board rejected any notion that replacements whose poststrike posi-

tions were in those departments could be deemed permanent replacements on the theory that they were being trained for their eventual positions during the strike.

In sum, the Board's decision drew distinctions among four basic categories of replacements:

| Categories of Replacement Nonstrikers | Board Decision as to whether Replacements Permanent | |
|---|---|---|
| | Yes | No |
| Worked after strike in the positions they filled during strike: | X | |
| Worked after strike in departments that were open during strike, in positions other than those they held during strike; but were in training for positions they held after the strike: | X | |
| Worked after strike in departments that were open during strike, in positions other than those they held during strike, and were not in training for positions they held after the strike: | | X |
| Worked after strike in departments that were closed during strike, whether or not in training for those positions during strike: | | X |

---

The Board distinguished the present case from *H. & F. Binch Co. v. NLRB*, 456 F.2d 357 (2d Cir.1972), on the ground that in *Binch* the parties had an understanding that the replacements would fill the pertinent positions "at a reasonably early date," *see id.* at 362; *see also Superior National Bank & Trust Co.*, 246 N.L.R.B. 721, 721 (1979) (replacements were permanent because mutual understanding and commitment included actual scheduling of work commencement), whereas here the Hospital could reach no such understanding with the nonstrikers because their starting dates in new poststrike positions could not be ascertained with any degree of certainty during the strike. Finding that (a) nonstrikers who were granted poststrike positions in departments that remained closed throughout the strike, and (b) nonstrikers who, in open departments, were granted poststrike positions that they did not fill and for

which they were not being trained during the strike were not permanent replacements, and noting the absence of persuasive proof as to the need for the preferences granted to those workers, the Board concluded that the Hospital had failed, to that extent, to establish a substantial business justification for refusing to reinstate striking nurses to their prior positions.

To remedy the unfair labor practices it found, the Board concluded that the Hospital should be ordered to, *inter alia*, (1) cease and desist from discriminating against striking employees, (2) "offer reinstatement to the strikers who, at the compliance stage of this proceeding, are determined to have been denied reinstatement as a consequence of the [Hospital]'s failure to reinstate them to their former or substantially equivalent jobs," Board Decision at 48, and (3) compensate such employees for any loss of pay or benefits they suffered as a result of the Hospital's discriminatory practices.

## II.  DISCUSSION

The Hospital challenges so much of the Board Decision as found that the Hospital committed an unfair labor practice by denying striking nurses reinstatement to their prior positions.  It contends principally that the Board's interpretation of the permanent-replacement rule was too narrow and that certain of the Board's findings were flawed.  For the reasons below, we reject all of the Hospital's contentions and enforce the Board's order.

### A.  *The Applicable Legal Principles and the Standard of Review*

In reviewing an order of the Board, we must give considerable deference to the Board's findings of fact and its interpretation of the Act.  We defer to its interpretations if they are rational and consistent with the goals of the Act.  *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473-74, 57 L.Ed.2d 370 (1978); *see also WPIX, Inc. v. NLRB*, 870 F.2d 858, 864 (2d Cir.1989) (Board's judgment as to whether employer's acts were unfair labor practices will not be disturbed " 'if its

construction of the [Act] is reasonably defensible' ") (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979)).  We uphold the Board's findings of fact if they are supported by substantial evidence in the record considered as a whole.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■  Under § 2(3) of the Act, 29 U.S.C. § 152(3), an employee whose work has ceased as a consequence of a labor dispute continues to be an "employee" within the meaning of the Act if he has not obtained regular and substantially equivalent employment.  *See, e.g., NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545-46, 19 L.Ed.2d 614 (1967).  So long as he remains an employee under the Act, he has the right to be reinstated after the dispute is resolved.  *Id.* at 381, 88 S.Ct. at 547; *H. & F. Binch Co. v. NLRB*, 456 F.2d at 364.  If, without " 'legitimate and substantial business justifications,' " the employer refuses to reinstate an employee after the strike, it is guilty of an unfair labor practice, for such a refusal would clearly "discourage employees from exercising their rights to organize and to strike guaranteed by §§ 7 and 13 of the Act." *Fleetwood Trailer Co.*, 389 U.S. at 378, 88 S.Ct. at 546 (quoting *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967)).

■  Nonetheless, during an economic strike the employer has the right to hire workers as permanent replacements in order to continue operations, *see, e.g., NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345-46, 58 S.Ct. 904, 910-11, 82 L.Ed. 1381 (1938), and if there was a legitimate and substantial business justification for such hiring, the employer is excused from reinstating strikers to positions that have been thus filled, *Fleetwood Trailer Co.*, 389 U.S. at 379, 88 S.Ct. at 546 (justification may be found if "the jobs claimed by the strikers are occupied by workers hired as permanent replacements during the strike in order to continue operations").  This principle may be applied not only to new hires but also to employees who cross

the picket line and are assigned permanently to positions other than those they occupied before the strike. *Trans World Airlines v. Independent Federation of Flight Attendants,* 489 U.S. 426, 435–38, 109 S.Ct. 1225, 1231–33, 103 L.Ed.2d 456 (1989).

■ The burden of proving justification is on the employer, and if it fails in its burden, its refusal to reinstate strikers who seek to return to work after the strike constitutes an unfair labor practice. *Fleetwood Trailer Co.,* 389 U.S. at 378, 88 S.Ct. at 546. As to the evaluation of the employer's proffer, "[i]t is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" *Id.* at 378, 88 S.Ct. at 546 (quoting *Great Dane Trailers,* 388 U.S. at 33–34, 87 S.Ct. at 1797).

### B. *The Adequacy of the Board's Findings*

The Hospital challenges the Board's findings to the extent that the Board found that certain nonstrikers who did not occupy their guaranteed positions during the strike were not "permanent replacements" within the meaning of *Fleetwood Trailer Co.* and *H. & F. Binch Co. v. NLRB,* and found that granting those employees preferences over strikers was not justified. It also contends that the Board Decision is flawed because the Board made no finding that strikers not "permanent[ly] replace[d]" and not returned to their prior positions were not offered positions that were substantially equivalent to those positions. We see no indication that the Board misapplied the principles discussed in Part II.A. above; we conclude that its findings were sufficient; and we find ample evidence in the record to support its findings.

■ The Board's finding that many of the nonstrikers did not occupy their guaranteed positions during the strike is supported by substantial evidence. The record reveals that some of the nonstrikers were guaranteed positions in departments that were closed throughout the strike. Indeed, the Hospital conceded this before the

Board, though it characterized the instances in which this occurred as "'few.'" Board Decision at 42. Other nonstrikers were guaranteed poststrike positions that they did not fill during the strike because they were in units that, though open, did not operate at full strength because the lower patient population warranted lower staffing levels. Even with respect to nonstrikers who did not occupy their poststrike positions during the strike, however, the Board accepted the Hospital's contention that some of those nonstrikers, *i.e.,* those who were assigned to poststrike positions in departments opened during the strike and who were being trained for their poststrike positions during the strike, should be deemed permanent replacements.

The Board's conclusions that (A) replacements who either were given poststrike positions in departments that remained closed during the strike, or were given poststrike positions in departments that were open during the strike but neither filled such positions during the strike nor were being trained for such positions during the strike should not be considered permanent replacements, but that (B) other nonstrikers should be considered permanent replacements, represent both an interpretation of the Act, its goals, and precedents, and a balancing of the rights of the strikers against the needs of the Hospital. The Board's conclusions were consistent with this Court's view that employers "must have latitude in hiring replacements sufficient, but no more than sufficient to th[e] end [of preserving production]." *H. & F. Binch Co.,* 456 F.2d at 362. The right to hire permanent replacements was thus limited, and the burden was on the Hospital to establish that all of its guarantees were justified by legitimate and substantial business necessity. It did not show sufficient predictability as to when the strike would end or as to whether there would arise a sufficient demand for services in a closed department to cause the Hospital to reopen that department prior to strike's end. It has not pointed to sufficient evidence in the record to persuade us that the Board abused its discretion in finding that the

Hospital had failed to carry its burden of showing that guaranteeing the nonstrikers in the "A" group above permanent positions that they would first occupy after the strike was no more than was necessary to ensure Hospital operations during the strike. This is especially the case since nonstrikers were allowed to select their choices of positions, including shifts, apparently without reference to the Hospital's existing or anticipated needs.

Giving due deference to the Board's balancing of the persuasiveness of the asserted justification against the discouraging effect of the preferences granted, and given the discriminating lines drawn by the Board as to which replacements were or were not found reasonably necessary, we cannot say that its conclusions were irrational, indefensible, or inconsistent with the goals of the Act.

■ We also reject the Hospital's contention that the Board's order should not be enforced because the Board did not find that strikers who were not "permanent[ly] replace[d]" and were not returned to their prestrike positions were not offered substantially equivalent positions. The Board contends that such a finding was not necessary and that it was entitled to find an unfair labor practice even if these strikers were offered substantially equivalent positions. We need not decide the merits of the Board's contention since our review of the Board Decision persuades us that the Board implicitly found that the positions offered these strikers were not substantially equivalent to their prior positions.

Although the Board did not explicitly state that each of the striking employees improperly denied reinstatement to their former positions had not been offered substantially equivalent positions, such an assessment is implicit in the Board Decision. Thus, in a detailed fact-finding section the Board discussed the staffing status of each Hospital department before, during, and after the strike, tracking individual nurses, both strikers and their replacements. As to striking nurses who were denied their former positions, the Board noted that several were offered only evening shifts instead of their prestrike day shifts; that one such striking nurse, for example, was denied her prior shift which had been designed to accommodate her child-care needs, and she was unable to return to work until another nurse voluntarily relinquished that shift; and that other such returning strikers were offered positions that required different skills from those previously required or that involved quite different patient care. The record also showed that some aggrieved strikers had to wait several months before acceptable positions were offered, and that several others were required to take reductions in pay due to reductions in hours or responsibility. These are the types of considerations that the Board has found relevant in determining whether positions were substantially equivalent. *See, e.g., Providence Medical Center*, 243 N.L.R.B. 714, 743–44 (1979).

It is thus plain that the poststrike positions offered to aggrieved strikers were not substantially equivalent to the positions they had occupied before the strike. This lack of equivalence is implicit in the Board's descriptions of pre- and poststrike positions, and the implicit finding is amply supported by the record.

■ Finally, we note that though the Board's Decision did not precisely identify or quantify the returning strikers who were denied their prior, or substantially equivalent, positions because their positions were occupied by nonstrikers who were not found to be permanent replacements, it was not inappropriate for the Board to postpone the identification of these injured strikers until the compliance stage of the proceedings. *See, e.g., NLRB v. J.H. Rutter–Rex Manufacturing Co.* 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 411, 80 S.Ct. 441, 448, 4 L.Ed.2d 400 (1960); *Rogers Manufacturing Co. v. NLRB*, 486 F.2d 644, 649 (6th Cir.1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974).

## CONCLUSION

We have considered all of the Hospital's arguments in support of its petition for

review and have found them to be without merit. The petition for review is denied. The Board's petition for enforcement is granted.

SNEED, Circuit Judge, dissenting:

I would grant the petition for review, deny the cross-petition for enforcement, and remand to the Board for additional findings.

The Board's conclusion that nonstrikers' guaranteed positions in departments that were not open during the strike were not "permanent replacements" is, in my view, erroneous as a matter of law. The Board employed an improper legal standard in reaching its decision. It held that no "legitimate and substantial business justification" for denying reinstatement to striking employees exists when the employer "had not and reasonably could not set an actual date for the reopening of the closed Hospital nor predict with some reliability when already reopened areas would expand their services." *The Waterbury Hospital,* 300 N.L.R.B. No. 140, slip op. at 43 (Dec. 21, 1990). Under these circumstances, replacement workers were "permanent" only if they actually commenced working in the contested position prior to the end of the strike and the relevant striker's unconditional offer to return to work. *See id.*

Nonetheless, the Board acknowledged that a "permanent replacement" could exist when the employer Hospital "awarded positions to more nonstrikers in a hospital area than the Hospital's operational needs required and some of these 'replacements' were in training sessions or in orientation in or away from their positions or areas." *Id.* slip op. at 43–44. This acknowledgment was based on the Board's decision in *Kurz–Kasch, Inc.,* 286 N.L.R.B. 1343 (1987). In addition, the Board recognized that a replacement may be "permanent," even though he has not assumed his position at the end of the strike provided an understanding existed that "this will occur at a reasonably early date." *The Waterbury Hospital,* slip op. at 40 (citing *H. & F. Binch Co. Plant v. NLRB,* 456 F.2d 357 (2d Cir.1972)).

The Board refused to find that any such "understanding" was reached in this case. The Administrative Law Judge, whose rulings, findings, and conclusions were approved by the Board, stated:

In those cases where the Courts and the Board have not required "replacements" to be on the job when the strike ends and the strikers seek reinstatement, it has been found that "an understanding [had] been reached" between the employer and "replacement" that arrival on the job would occur either at a subsequent fixed date or at a "reasonably early date" which might occur after the strike as evidenced by the facts of the respective cases. In the instant case I do not believe that such an "understanding has been reached." The Respondent acknowledged that it had not and reasonably could not set an actual date for the reopening of the closed hospital areas nor predict with some reliability when already reopened areas would expand their services. Therefore, under these circumstances, unless the "replacement" commenced working in the position awarded during the strike and prior to the striker's unconditional offer to return to work, the non-striking employee would not be a "permanent replacement" justifying the denial of reinstatement to returning strikers.[90] Of course this would not include instances wherein the Respondent awarded positions to more nonstrikers in a hospital area than the Hospital's operational needs required and some of these "replacements" were in training sessions or in orientation in or away from their positions or areas.

*Id.* slip op. at 43–44.

In footnote 90, indicated in the above passage, the Administrative Law Judge made his views even more precise. It read:

Contrast *Kurz–Kasch, Inc.,* supra; *Superior National Bank & Trust Company* [246 N.L.R.B. 721 (1979) ]. Moreover, the Respondent would not be deprived of his right to hire permanent replacements under *Mackay* by such a ruling. *It could have hired at will new nurses or licensed practical nurses or assigned*

*crossovers to any job for which the Hospital had a current or reasonably predictable need during the strike. The Respondent offered no proof that it could not successfully recruit nonstriking employees unless it offered them only those positions it awarded during the strike.* While I am not convinced by the record evidence that the Respondent's reinstatement system was discriminatory on its face, I am convinced that by guaranteeing some of the nonstrikers jobs which the Hospital's operational needs did not justify and instead using them in a different capacity during the strike, and after the strike returning them to the awarded position to the exclusion of returning strikers the Respondent did violate the Act.

*Id.* slip op. at 43 n. 90 (emphasis added).

These two passages from the Administrative Law Judge's decision underscore the requirement that the position to which a replacement is to be appointed must be one whose time of opening could be reasonably predicted.

Under the facts before us, the balance between the employer's right to protect the enterprise by employing permanent replacements for strikers during the strike and the strikers' immunity from employer actions destructive of their reinstatement rights favors the striking employees excessively.

Predictability under circumstances such as confronted the Waterbury Hospital is extremely difficult. Not only is the duration of the strike uncertain in the absence of a complete capitulation by the Hospital, but it, like other hospitals, can only function through the use of numerous specialists performing their tasks precisely and accurately and in a manner that permits the coordination that comprehensive hospital care requires. The employee market accordingly consists of numerous and differently qualified specialists with somewhat different compensation expectations. Obviously some are in greater demand than others, and their availability at any given point in time is difficult to determine. As the facts of this case indicate, there are circumstances in which these specialists will accept temporary employment in less-desirable positions in order to maintain their income or for other reasons.[1] Quite understandably, they desire assurance that their talents will be fully utilized as soon as possible. Equally understandable is the providing of that assurance by the hospital management.[2]

---

1. It seems that in the nursing industry, day jobs, in whatever area of specialty, are at a premium. In its efforts to open various units, the Hospital was able to fill in the day slots easier than the night slots with new hires and crossovers. These nurses would agree to work in areas of specialty or time slots other than those they most preferred, with the understanding that when the Hospital was able to open the units to which these nurses wished to belong permanently, they would take over the sought-after position.

2. Indeed, and quite to the contrary of the Administrative Law Judge's conclusions emphasized earlier, it was the testimony of three Hospital administrators that a guarantee of permanency was absolutely necessary in securing the employment of new hires and crossovers. To take one illustrative example, the Associate Director of Nursing, who apparently had primary hiring authority during the strike, relayed the dynamics of hiring nurses during the strike as follows:

Q: What actually did you say to them and what did they say to you, in your own words?

A: Well, most people would come in looking for a specific job, based upon the ads. And, I would tell them that, say they came in looking for pediatrics, I would make it clear that pediatrics is not open, but that we are planning to open pediatrics, and that if you come in, the floor that is open is Pomeroy 7, and you would have to be stationed on that floor, awaiting enough nurses to open the pediatric unit. Essentially, many of them accepted that, some of them would not. . . .

Q: Now, as you talked to these people was the commitment to a particular position, did they ask for a particular position?

A: Oh yes, they all asked for a particular position.

. . . .

I [told] them that the Hospital and the Hospital's President would make a commitment to the position, that they were accepting and that no matter what the outcome of the strike that would be their position.

Q: And a position, would that be in terms of department and shift hours?

A: Yeah, yes.

Transcript at 1127–28 (testimony of Norma Shidlovsky).

A hospital, while not unmindful of its profit and loss position, is a service institution heavily regulated by agencies other than the NLRB. Its many masters demand different and sometimes conflicting responses. In this case the employer Hospital was concerned during the strike with its licensure positions as well as with maintaining a functioning residency program, and it therefore wished to resume operations as rapidly as possible. Despite this desire, some departments or activities must and should be opened before others. Emergency rooms should precede surgery and prenatal clinics before maternity wards, for example. Also, there existed no complete cadre of specialists sufficient to operate a hospital such as Waterbury available on a few days' or weeks' notice.[3] It could not be made operational upon command as hospital ships were in Operation Desert Storm. By necessity, it was a slow process with new hires and crossovers, at any given point in time before the strike's end, not being qualified in all the skills, or in the numbers, sufficient to enable all departments and skill centers to become fully operational.

To ask, as did the Administrative Law Judge in this case, to predict when the hospital would open, and when its various departments or skill centers would open, was to ask what could not be answered. Of course, there was no response. That absence, however, should not have deprived the Hospital of a substantial part of its "right to protect and continue [its] business by supplying places left vacant by strikers." *NLRB v. Mackay Radio and Telegraph Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938).

That right should not be measured by a rule designed for employers able to draw from large pools of workers all more or less having the same skills. Under those circumstances new hires and crossovers should be protected from being bounced, as the Board here holds, only when the time at which they are to assume their position is reasonably fixed before the end of the strike.

The Board's basic error was that it used a formulation of the *Mackay Radio* standard quite compatible with crossovers and new hires in strikes in the industrial sector but totally incompatible with crossovers and new hires in labor disputes arising in the health care service sector. In this case, the Board, through the Administrative Law Judge, should have asked, "Was the Waterbury Hospital attempting in a reasonable manner to restore itself to full operation, through the use of replacement workers, as speedily as practicable without regard to the anticipated duration of the strike?" An affirmative answer should prevent displacement of replacement workers from the positions promised to them upon employment by the Hospital by returning striking employees. A negative answer should call for the application of those rules approved and applied by the Board in this case.

---

The entire context of this exchange, which is reproduced in an appendix to this dissent, makes even more clear the business justification for the Hospital's actions.

**3.** Again, that this was so is established in the record. It was the specific (and unrebutted) observation of the Director of Nursing Services that, under the circumstances of the strike, predicting when new units would open was impossible. The testimony went as follows:

Q: [W]as the influx of staff on a predictable basis of steady growth?

A: No. No. It was—it was slow. Some days there might be two nurses, and then a week, a week and a half could go by and we might have no one new coming in.

. . . .

Q: Did this make it difficult to predict your ability to open new units?

A: We could not predict when we could open new units. We had to have the staff in-house before we could then say, all right, now we can progress.

Transcript at 987 (testimony of Denise Shanahan).

This is but one example from a trial transcript which as a whole demonstrates, in my view, that the Hospital was forced to offer and commit to permanent positions for strike-breaking nurses in order to induce them to come to work, that it was the understanding of these nurses that they may be required to work in temporary positions until the proper staffing mix could be mustered to open their promised unit, and that opening the various hospital units must by necessity be accomplished on a "wait and see" basis, depending on various unpredictable factors such as community need, patient census, and staff availability.

Because neither the Administrative Law Judge nor the Board approached the case in this manner, I respectfully dissent.

### APPENDIX TO JUDGE SNEED'S DISSENT

A more lengthy excerpt of testimony before the Administrative Law Judge better illustrates the business justification of the hiring strategy the Hospital engaged in during the strike. It also illustrates the deficiencies of the rigid application of the *Mackay Radio* rule as laid down by the Board and approved by the majority.

Testimony of Denise Shanahan, Director of Nursing Services:

"Q: Following the rejection of the hospital's June 23rd offer, were there meetings of the Waterbury Hospital management staff with positions to discuss what action to take after this?

"A: The meetings included—we had daily meetings.

"And the meetings did include the chiefs of service, the chief of staff, general hospital administration and nursing administration.

"Q: Did you participate in these meetings?

"A: Yes, I did.

"The discussions centered around the fact that it looked like there was not going to be a settlement in the immediate future.

"We had three contracts that were not settled, from three different bargaining units: The RN unit, the LPN unit and service and maintenance. And none of the three of these contracts had been settled. We couldn't perceive a target date as to when these might be settled. And the question came up about how long can we just sit and not open the hospital for the community.

"Q: What were the main factors considered at these meetings?

"A: Well, first of all, patients and patients' families who were—I know there were newspaper articles. I can't remember if it was at this time or—it was around this time that the discussion was patients were not able—patients who need surgery were waiting extended periods of time.

"Patients who needed acute medical care, critical care, most had to be transferred out of the city because St. Mary's, obviously, could not accommodate.

"And this was very disruptive, not only to the patient but to the family, as well.

"Physicians depended on Waterbury Hospital to admit their patients, and while they had temporary privileges at St. Mary's, obviously, with a combination of physicians who usually brought their patients only to Waterbury Hospital and those patients [sic] who usually brought their patients only to St. Mary's Hospital, both could not be accommodated.

"So there was a great deal of pressure there.

"And then finally there was the issue of the residency programs. The residents, new residents, would just start July 1st, and it was not a matter of just asking another hospital to accept these residents for a period of time. There had to be a program developed for them.

"Also, the residents themselves were very concerned about the situation. What was going to happen to them? How were they going to get their—I don't know if credits is the right word, but accumulate the clinical experience they needed for that year. And, also, their educational programs.

"It's not the end of June. They cannot just decide to go off to another hospital. Hospitals had taken the number of residents they were allowed to accept by, I would guess, by the previous January. All of that had been settled. So this put them in a lurch.

"Q: Was a decision made at that time about opening services in the hospital?

"A: At that time the decision was that we had to start opening the hospital for the community. Yes.

"Q: And was a plan worked out as to how this would be accomplished?

"A: We discussed the fact that we could not—you know, more than half of our work force was out on strike.

"Q: Excuse me. Let me backtrack there.

"At the time the strike started—

"JUDGE KLEIMAN: No, no. Unless you're withdrawing the question—

"MR. PALMER: I'm sorry.

"JUDGE KLEIMAN:—let the answer be completed.

"MR. PALMER: No, I'm sorry.

"Q: [By Mr. Palmer] Go ahead.

"A: More than half or about half of our work force was out on strike.

"Most of the people who were to give direct care were part of that group, i.e., the RNs and the LPNs. We did not have enough nurse managers, obviously, to initiate opening, saying we are going to open Waterbury Hospital, or even open another unit with just our nurse managers alone.

"Remember, we already had the nurse managers in Chase Clinic and we had the nurse managers working in one-day surgery.

"And I didn't mention that that involved an operating room, also. So we had Jan Shahen, who was here on the stand earlier, and her head nurse and her clinical instructor involved in running an operating room.

"So we just didn't have numbers of nurse managers to go ahead and open up a 50 bed unit, let's say.

"We talked about opening some beds on Pomeroy 7 with use—utilizing the remaining nurse managers that we had. But we also had to conclude that we either had to try some way to get our staff back to work or we had to advertise for staff.

"Q: Then did you start to follow that approach?

"A: Yes, we did.

"I believe the second week in July we started advertising for ...

"Q: What staff did you advertise for?

"A: We advertised for Registered Nurses, and it was an ad involving all units in the hospital.

"Q: In point of fact, how would you reach a goal of opening all services? Obviously, you couldn't do all that at once?

"A: No.

"Q: How would you start?

"A: We had to start gradually. We had to start, first, getting the staff into the hospital. And if we were talking about all new staff, getting them oriented to our facility.

"Once this was in place, then we could start to open hospital beds or a hospital unit, as it came to be.

"And when we first opened Pomeroy 7— and, again, I don't remember how many beds we started with, but it was very few—as we got staff into the hospital for employment, we increased the number of beds. But it was very slow. It was painstakingly slow. Everybody wanted it done yesterday.

"Q: And what other services did you open in the first phase?

"A: We kept ourselves—well, concomitant with that, psychiatry was opening beds, and I'm not sure—I don't think that they went beyond one unit. I don't think they did.

"We also had the outpatient clinical services opening. Oncology, the GI lab, the vascular lab, cardiology.

"One of our goals early on was to try to get some critical care beds open to accommodate. And that was accomplished, I believe, in August. We opened three critical care beds.

"Q: Under Connecticut law, is a hospital required to notify the Department of Health after it receives a ten-day strike notice?

"A: We have to notify the Department of Health of the ten-day strike notice; and then they, in turn, ask us for our plan.

"Q: Did you give them such a plan?

"A: Yes. Yes.

"When the decision was made to, for instance, open Chase clinic, we had to notify the State Department of Health first.

"Q: Did you do so?

"A: Yes.

"Q: And what—

"A: And then with each subsequent area that was opened, we had to notify the State Department of Health.

"Q: Did investigators from that department come to the hospital?

"A: Every day.

"Q: And did they make an investigation of the services you were offering?

"A: They made rounds on every unit or department that was open. They spoke to patients and to visitors. They spoke to staff. They evaluated or they looked at our staffing for the day and for evenings— they looked at the staffing for each shift on that particular unit. Not only the numbers of people, but the qualifications of the people who were there.

"Now, once they had gone through and checked the qualifications on a particular nurse, they didn't ask for it each day.

"Q: So they checked each individual nurse's qualifications?

"A: Yes.

"Q: How long did this daily visit continue?

"A: Throughout the strike.

"Q: And did they report their findings to you?

"A: Well, I met with the investigator just about every day, and they were pleased with what they found in nursing services, the care that the patients were getting.

"Q: Did they ever issue any complaints about poor service?

"A: No.

"Q: And did the advertising continue during the remainder of the summer?

"A: Yes, it did.

"Q: Did additional nurses come to work?

"A: Yes.

"Q: At some time during July did the question come up as to the type of commitment, if any, that the hospital would make to these returning nurses, concerning their employment after the strike?

"A: Not initially. It didn't come up until towards the middle or end of July.

"Q: And how did this arise?

"A: Well, people were talking about the newsletter, the newsletter from the CHCA 1199, stating that there were comments that the nurses who crossed the picket line or the new hires would not be able to retain those positions.

"You know, I'm not quoting directly, but the gist of it was the concern of the nurses who crossed the picket line and the nurses who were newly hired, was that they—the Union was saying they were going to lose their jobs when the strike was over.

"MR. MARCIONESE: Your Honor, I would object to this testimony concerning what nurses said is all hearsay and some of it is even double hearsay.

"JUDGE KLEIMAN: I understand that. I'll take that as a consideration with regard to the weight. But we've had the hearsay testimony. That doesn't mean that this is allowed, but this is a relation of what happened, what occurred and how it occurred.

"I'm going to allow it. I'll overrule the objection.

"Go ahead, you can finish your answer.

"THE WITNESS: I think I have finished.

"JUDGE KLEIMAN: Okay.

"Go ahead, Mr. Palmer.

"Q: [By Mr. Palmer] Did any nurses express these concerns to you directly?

"A: Oh, yes. They did. That's what I was repeating.

"I can't repeat word for word what they were saying, you know, at this point in time. It's well over a year later. But I was giving you the gist of what people were saying directly to me."

Transcript at 975–84.

Testimony of Norma Shidlovsky, Associate Director of Nursing:

"Q: Now you said a decision was made to open the Hospital can you describe to us what that decision meant in terms of what

particular facilities and how that goal would be accomplished?

"A: Well, early on, based upon the request of the Chief of Obstetrics, who had concern about the pre-natal clinical patients we decided to open the Chase Clinic.

"Then the hemodialysis patients, who it became difficult to place, we decided to open the Hemodialysis Unit.

"Then with the number of the run day types that had back logged we decided to open the one day, which meant the operating room would be opened also.

"After that, with the request for inpatient beds we started to open the beds on Pomeroy 7.

"JUDGE KLEIMAN: When was this decision made, in and about when?

"WITNESS: It was, the decision to expand the beds came after the June 23rd, the original, the opening of Chase Clinic, I think was earlier, June 14th, I am going to say, 12–14, because these are walk in patients, because of the ah—primarily for the pre-natal patients.

"JUDGE KLEIMAN: The decision to open the Hospital departments, itself, originally, occurred when?

"WITNESS: After the June 23rd rejection of the Hospital's proposals.

"JUDGE KLEIMAN: A week after that?

"WITNESS: Yes, I would say we were meeting early in July ah, we were meeting, practically daily, to discuss the, especially the crunch at the sister hospital. And ah, the decision was made, I am going to say it was in the last week of June, about, to just go ahead to plan for the inpatient beds.

"JUDGE KLEIMAN: Okay, that was the decision and when did it really open?

"WITNESS: The Pomoroy 7 opened July the 14th, I think, 14th, 15th, 16th, in there.

"JUDGE KLEIMAN: Okay, was Chase Clinic open before this?

"WITNESS: Oh yes, Chase was opened in June.

"JUDGE KLEIMAN: Okay. So actually the decision was made during the latter part of June, and the Hospital was opened in the latter part of June, initially, right?

"WITNESS: The clinic and the one day was open in June, yes.

"JUDGE KLEIMAN: Go ahead, Mr. Palmer.

"MR. PALMER: Now, who staffed the clinic in the one day surgery?

"A: The nursing managers.

"Q: So I think perhaps that we want to identify, when did the first staff nurses come to work during the strike?

"A: Well, the first staff nurses were the hemodialysis nurses who returned somewhere around July 3rd or 4th, in there. And ah, we then had a trickling of nurses coming over ah, the week after that, ah, we started to run our ads., I think that was around July 13th, that we ran our ads.

"Q: And what were the ads., what did the ads. cover in terms of nursing services that you were seeking to open?

"A: I'm pretty sure we advertised for all services, at that time, medical, surgical, intensive care, of course the big problem was maternity, maternity was closed, obviously, ah, all the services we advertised for.

"Q: Did the first ads cover LPN's as well as RN's?

"A: The first ads?

"Q: Yes.

"A: No. The first ads. were for registered nurses only.

"Q: And did the advertising continue, during the rest of the strike?

"A: Yes, it did.

"Q: And as the strike went on did you run different types of ads. from just, for general nurses?

"A: Yes we hm, continued to focus, we'd alternate with general ads. then we would focus in on speciality area ads. Ah, after a while we advertised for assistant head nurses, ah, we advertised for licensed practical nurses, and then hm, based upon some of the people I had interviewed we decided we had to run an ad. for a refresher course.

"Q: Will you describe for us, the interviewing, hiring process, as a result of people beginning, nurses beginning to come to work during the strike?

"A: I would say that I probably interviewed and hired close to a hundred percent of them. There must have been one day I didn't do, or two days. The interviewing process was no different from what it had been before, in that people had to meet the requirements which included their license, their references, their ah, abilities to perform the job.

"On interview, of course they knew there was a strike in progress, and if a position was accepted we went over the details of how to cross a picket line, etc."

Transcript at 1123-27.